(C. D. 90)

E. I. DU PONT DE NEMOURS & CO. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 2, 1939)

*Lamb & Lerch (John G. Lerch* and *David A. Golden* of counsel) for the plaintiffs.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Charles J. Miville* and *Daniel G. McGrath,* special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges; TILSON, J., dissenting

DALLINGER, Judge: This is a suit against the United States, arising at the port of Norfolk, Va., brought to recover certain customs duties alleged to have been improperly exacted on a particular importation invoiced as "Colin Presses." Duty was levied thereon at the rate of 40 per centum ad valorem under paragraph 372 of the Tariff Act of 1930 as textile machinery not specially provided for. It is claimed that said articles are properly dutiable at 27½ per centum ad valorem under the same paragraph as machines not specially provided for.

A drawing illustrating the machine is in evidence as Exhibit 1. A jar containing cellulose acetate in its condition before entering the machine is in evidence as Illustrative Exhibit A and a jar containing cellulose acetate in its condition after having passed through the machine is in evidence as Illustrative Exhibit B, and three photographs of certain parts of the machine are in evidence as Illustrative Exhibit C.

In addition to said exhibits the plaintiffs offered in evidence the testimony of a single witness, Paul Knapp, chemical supervisor of the

plaintiff corporation, no evidence having been offered by the Government.

The witness testified that he had acted in the capacity of general superintendent in the installation of the two presses constituting the merchandise at bar; that he had seen this type of press in operation in France as well as in the Waynesboro plant of the plaintiff corporation in this country; that said presses operate entirely upon cellulose acetate, which is a compound of cellulose made by treating cotton linters in acetic acid. The witness then described the operation of the presses as follows:

The wet cellulose acetate is allowed to fall into the hopper shown on the right-hand diagram under the word "longitudinale", and after falling through the hopper inlet it falls on to a screw, clearly shown in the cross section below the hopper in light. The screw is turning slowly and the cellulose acetate is advanced to the left, where, finally after advancing about three feet, it meets an adjustable cone shown directly under 6052. The adjustable cone acts as a block mechanism, whereby the screw is enabled to force the cellulose acetate against this block device, thereby pressing water out of the cellulose acetate, and nothing happens during this traverse of the cellulose acetate, except to get rid of some water. The water as squeezed from the cellulose acetate passes out through the screen that surrounds the screw, shown as number 6069. The screw is perforated and the water drops by gravitation from the screw, and is carried away to the sewer. The cellulose acetate finds its way out around the adjustable cone and drops into the shoot or hopper just above the number 6129. At this point the cellulose acetate is somewhat drier than when it was allowed to fall by gravity into the hopper as originally described. The screw is driven by the mechanism shown at the extreme right-hand side of the diagram, spiked to the screw mechanism, it is driven by the gear mechanism at the right-hand side of the drawing. The connecting shaft for this drier mechanism is shown under the words "Vue de l'Arriere". This connecting shaft is shown in detail near the number 6035, which is crossed up on this drawing, but demonstrates where the moving shaft is found. This shaft has mounted on it two pulleys. The one near the end of the shaft is supported by what is formally known as a post.

The witness then testified that as a result of going through the machine there is no change in the condition of the cellulose acetate except that there has been a removal of approximately 82 per centum of water.

On cross-examination the witness testified that the plant which he supervises makes cellulose acetate for use in rayon plastic goods, lacquers, and photo films; that while the term "rayon" was formerly known as artificial silk the latter term has been dropped from the industry; that cellulose acetate after the water has been pressed out as above described in the manufacture of rayon is put into a solution of acetone and forced out through a nozzle known as a spinnerette; that in forcing the solution through the spinnerette the acetone is driven off, leaving a filament which is spread out to dry on highly polished drums, the final result being a thin sheet; and that the operation performed by the presses in question is simply a drying process and hardly a manufacturing process.

On redirect examination he testified that the material represented by Illustrative Exhibit B is used for a number of purposes, including cellulose, rayon, and films.

On recross-examination he testified that he did not regard the pressing out of water by the machine represented by Exhibit 1 as a step or process in the manufacture of rayon.

Upon this record counsel for the plaintiffs in their brief filed herein contend that because nothing is added to the cellulose acetate in the operation of the machines at bar, the latter are mere cleaning or washing machines and as such are not textile machines within the meaning of paragraph 372, citing in support of such contention the case of *Hygrolit, Inc.* v. *United States*, T. D. 47808, 68 Treas. Dec. 95; *Geo. W. Bollman & Co.* v. *United States*, T. D. 47671, 67 Treas. Dec. 712; and *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. 459, T. D. 43916, in all of which this court held the involved machines not to be textile machinery. In the first of said cases (*Hygrolit, Inc.* v. *United States*) we held that a machine which merely cleaned and removed the kinks from cotton yarn was not a textile machine within the meaning of said paragraph 372. Likewise in the *Bollman* case it was held that machines which merely washed and dried wool noils were not textile machinery within the meaning of said paragraph. And finally in the *Passaic Worsted Co. et al.* case we held that certain machines which tore apart the fleece from raw wool and washed, cleaned, and dried the same were not textile machinery.

On the other hand, as counsel for the Government points out in his brief, the United States Court of Customs and Patent Appeals in the case of *Jett & Co.* v. *United States*, 18 C. C. P. A. 86, T. D. 44044, held that various machines employed in the production of raw silk or rayon were textile machines; and in the case of *Edward Jefferson (Inc.)* v. *United States*, 18 C. C. P. A. 322, T. D. 44583, the same court held certain backwashing machines which served only to wash and dry wool slivers after the woolen material had been carded to sliver form, to be textile machinery within the meaning of paragraph 372 of the Tariff Act of 1922.

It is to be observed that in all of the cases cited by counsel for the plaintiffs the involved machines which washed and cleaned the original raw materials were held by this court and the appellate court not to be textile machinery. On the other hand, where the washing or cleaning process took place after the original material had been advanced in manufacture as in the case of *Edward Jefferson (Inc.)* v. *United States, supra*, the appellate court has held that such a machine was a textile machine.

In the instant case it is uncontradicted that the original textile material consisted of cotton linters, whereas the material processed by the machines at bar consists of cellulose acetate which is a compound

made by treating the original textile material, cotton linters, with acetic acid.

Moreover, in the recent case of *United States* v. *American Textile Engineering, Inc.*, T. D. 49597, 73 Treas. Dec. 907, the appellate court has substantially modified its former strict interpretation of paragraph 372 as laid down in the case of *Passaic Worsted Co. et al.* v. *United States, supra.* In the former case the court said:

It is argued by counsel for appellee that the hygrolitic process is not a manufacturing process, because it does not produce a new article having a new name, character, or use, and that as this court held in the *Passaic Worsted Co. et al., Jett & Co.*, and *Edward Jefferson (Inc.)* cases, *supra*, that the provisions for textile machinery in paragraph 372 of the Tariff Act of 1922 were intended to include only such machines as were used in the manufacture of textile materials and as those provisions are substantially the same as those here under consideration, the hygrolit machine, of which the involved articles are parts, is not a textile machine.

\* \* \* \* \* \* \*

It should be borne in mind that the statutory provision is not for machines used in the manufacture of textile materials, but is a broad sweeping provision covering all textile machinery, not specially provided for.

It may be that the language used in the *Passaic Worsted Co. et al.* case, *supra*, restated and followed in the *Jett & Co.* and *Edward Jefferson (Inc.)* cases, *supra*, is open to the interpretation placed upon it by counsel for appellee. However, as is apparent from our decision in the latter case, this court, in stating in those decisions that a textile machine was one used in the manufacture of textile materials, did not mean to be understood as holding that *only such machines as actually converted a material into a new material or article having a new name, character, or use* were intended by the Congress to be included within the statutory provisions for all other textile machinery.

It may require more than one manufacturing process to convert a textile material into a new textile material having a new name, character, or use. Indeed, it appears from the Summary of Tariff Information 1929, Vol. 1, pp. 823–835 (prepared by the United States Tariff Commission for the use of the Committee on Ways and Means of the House of Representatives), that many machines referred to therein as textile machinery, such as "machines for winding both raw silk and spun silk, as well as rayon, into various forms, bobbins, cops, skeins, 'beams' and there are other shapes for dyeing, or weaving in the loom," have nothing whatsoever to do with changing the character of the material on which they operate.

Upon all the facts and the law applicable thereto we hold that the machines in question are textile machinery within the meaning of paragraph 372 of the Tariff Act of 1930, and are properly dutiable thereunder at the rate of 40 per centum ad valorem as classified by the collector. All claims of the plaintiffs are therefore overruled and judgment will be rendered accordingly.

### DISSENTING OPINION

TILSON, Judge: In the case of *United States* v. *American Textile Engineers*, 26 C. C. P. A. 48, T. D. 49597, in holding that the hygrolit machine was a textile machine, the appellate court went no further

than to state that the Summary of Tariff Information referred to "machines for winding both raw silk and spun silk, as well as rayon, into various forms, bobbins, cops, skeins, 'beams', and there are other shapes for dyeing, or weaving in the loom," as textile machines, with the inflection, of course, that the court considered such machines to be textile machines.

The appellate court in said decision also stated as follows:

The hygrolitic process actually changes the character of the yarn; gives it elasticity; strengthens it; and lessens its tendency to kink by "setting the twist."

The record in this case shows that these are *not* "machines for winding both raw silk and spun silk, as well as rayon, into various forms, bobbins, cops, skeins, 'beams' and * * * other shapes for dyeing, or weaving in the loom." The record in this case does show that the operation performed by these machines does *not* actually change the character of the yarn; that it does *not* give it elasticity; that it does *not* strengthen it; and that it does *not* lessen its tendency to kink by "setting the twist."

It is my view that since the evidence in this case does not bring these machines within either of the two classes of machines referred to by the appellate court in the *American Textile* case, *supra*, these machines are not textile machines.

In the *American Textile* case, *supra*, the appellate court reviewed its previous decisions in the cases of *Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656; *Jett* v. *United States*, 18 C. C. P. A. 86; *Jefferson* v. *United States*, 18 C. C. P. A. 322, and *Passaic Worsted Co.* v. *United States*, 17 C. C. P. A. 459. Under the pronouncements on this subject, as they now stand, I do not feel justified in going further than the appellate court went in the *American Textile* case, *supra*, which I would be required to do if I should hold these machines to be textile machines.

For the reasons stated I therefore decline to join my associates in holding these machines to be textile machines.